

FILED

Dec 19 2017, 8:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Debra S. Andry
Lawrence County Public Defender
Agency
Bedford, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Chandra K. Hein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

E.B.,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner.*

December 19, 2017

Court of Appeals Case No.
47A04-1706-JV-1263

Appeal from the Lawrence Circuit
Court.
The Honorable Andrea K. McCord,
Judge.
The Honorable John M. Plummer,
III, Referee.
Trial Court Cause Nos.
47C01-1702-JD-99
47C01-1702-JD-86

**Barteau, Senior Judge**

## Statement of the Case

[1]     A juvenile court determined E.B. is a delinquent child for committing acts that,

if committed by an adult, would have constituted two counts of intimidation,

both Level 6 felonies.[1]  E.B. appeals the court's determination.  We affirm in part and reverse in part.

## Issue

E.B. raises one issue, which we restate as:  whether there is sufficient evidence to sustain the juvenile court's adjudication of delinquency.

## Facts and Procedural History

E.B. attended high school in Lawrence County.  In January 2017, Assistant Principal Todd Tanksley disciplined E.B. for misconduct in the school cafeteria.  Tanksley called E.B.'s father to make him aware of the situation.

In mid-February 2017, E.B. sent a text message to a fellow student, J.G.  E.B. advised J.G. to wear red on the following Tuesday, explaining that he intended to shoot "anybody who wasn't wearing red."  Tr. Vol. 2, p. 16.  E.B. later sent a text message to J.B., another fellow student.  E.B. told J.B. that next Tuesday, he should "wear red and get under the desk" when he heard music.  *Id.* at 24.  E.B. further told J.B. to tell "the ones that [he] care[s] about."  *Id.* at 25.  J.B. shared E.B.'s instructions with several of his fellow students via text messages.

Later that same evening, E.B.'s sister, Em.B., was walking by E.B.'s room when she heard him talking on the phone with an unknown person.  E.B. said

---

[1] Ind. Code § 35-45-2-1 (2014).

he was going to bring a gun to school and shoot Tanksley because "he didn't like him." *Id.* at 53.

[6] The next morning, on February 15, 2017, J.B. approached three students in the school cafeteria. He told them to wear red next Tuesday and get under their desks when they heard heavy metal music over the public-address system. He further told them the instructions came from E.B. and directed them to spread the word to other students.

[7] One of the students J.B. spoke with went to Tanksley's office later that morning, at 8:30 a.m., and told him what J.B. had said. The student did not know J.B.'s name, so Tanksley consulted security video recordings of the cafeteria and identified J.B. He spoke with J.B. and confirmed that J.B. had told other students to wear red next Tuesday and get under their desks when they heard certain music over the public-address system. Next, Tanksley spoke with Em.B., who was also a student at the school. She informed Tanksley of E.B.'s statement that E.B. intended to bring a gun to school and shoot him. E.B. was not at school that day.

[8] Tanksley called the police, and two detectives were dispatched to the school. Tanksley contacted E.B.'s father and asked him to come to the school. Upon arriving, E.B.'s father spoke with Tanksley and the detectives. The detectives asked E.B.'s father for permission to search E.B.'s bedroom, and he signed a written form granting consent to search.

[9] The detectives followed E.B.'s father to his house and searched E.B.'s bedroom pursuant to the signed consent form. E.B. was in the house. The detectives found a handwritten document entitled "Checklist for Project . . . School Shooting." Tr. Vol. 3, State's Ex. 8. The document listed items he intended to take with him to school, including a rifle, a handgun, and a knife, as well as ammunition, a holster, and a radio. E.B. further listed "areas of completion or major targets," including "Tanksly [sic]," the cafeteria, and "anyone I can." *Id.* Finally, the document listed people not to be shot, including "anyone the [sic] wears red" and J.G. *Id.* The officers also found the following items in E.B.'s bedroom: several shotgun shells and bullets, a holster, and a tactical vest.

[10] After the search, the detectives arrested E.B. and took him to the Sheriff's Department. E.B.'s father followed them there. Both E.B. and his father signed a document permitting the officers to question E.B. E.B. conceded during the interview that he wrote the document that the detectives found in his room. He further conceded that he told several people to wear red on Tuesday. E.B. further stated he put Tanksley's name on the list of targets because Tanksley did not like him.

[11] Later that day, school officials notified parents about the situation via a phone message. On an average day, 150 students are absent from school. The day after the school notified parents, 588 students were absent.

[12] On February 21, 2017, the State filed a Verified Petition Alleging Delinquency in Cause Number 47C01-1702-JD-99, in which the State contended as

"Specification One" that E.B. committed an act that would have been intimidation, a Level 6 felony if committed by an adult, for his actions involving Tanksley. Appellant's App. Vol. II, p. 9. The State later amended its petition to add "Specification Two," alleging E.B. committed an act that constituted a second act of intimidation, also a Level 6 felony, for interfering with the occupancy of the school. *Id.* at 38. The juvenile court held a fact-finding hearing and determined E.B. had committed both acts of delinquency as alleged by the State and was a delinquent child. The court issued a dispositional order, and this appeal followed.[2]

## Discussion and Decision

[13] When the State petitions to have a juvenile adjudicated as a delinquent for committing an act that would be an offense if committed by an adult, the State must prove every element of that offense beyond a reasonable doubt. *H.J. v. State*, 746 N.E.2d 400, 402-03 (Ind. Ct. App. 2001). On review of a juvenile delinquency adjudication, we neither reweigh the evidence nor judge the credibility of witnesses. *C.S. v. State*, 735 N.E.2d 273, 276 (Ind. Ct. App. 2000), *trans. denied*. Instead, we consider only the evidence most favorable to the judgment and the reasonable inferences therefrom. *Id.*

---

[2] In Cause Number 47C01-1702-JD-86 (JD-86), the State alleged E.B. was a delinquent based on an incident not related to the events at issue here. The juvenile court determined E.B. was a delinquent in that case. E.B. initially sought to appeal the judgment in JD-86 along with the judgment in Cause Number 47C01-1702-JD-99, but he now "finds no disputable issue" arising from JD-86 and does not present any claims for review as to that case. Appellant's Br. p. 4.

The statute that defines the offense of intimidation provides, in relevant part:

> (a) A person who communicates a threat to another person, with the intent:
>
> (1) that the other person engage in conduct against the other person's will;
>
> (2) that the other person be placed in fear of retaliation for a prior lawful act; or
>
> (3) of:
>
> (A) causing:
>
> (i) a dwelling, a building, or other structure; or
>
> (ii) a vehicle;
>
> to be evacuated; or
>
> (B) interfering with the occupancy of:
>
> (i) a dwelling, building, or other structure; or
>
> (ii) a vehicle;
>
> commits intimidation, a Class A misdemeanor.
>
> (b) However, the offense is a:
>
> (1) Level 6 felony if:
>
> (A) the threat is to commit a forcible felony . . . .

Ind. Code § 35-45-2-1. The statute further defines a "threat" as:

> An expression, by words or action, of an intention to:
>
> (1) unlawfully injure the person threatened or another person, or damage property;
>
> (2) unlawfully subject a person to physical confinement or restraint;
>
> (3) commit a crime;
>
> (4) unlawfully withhold official action, or cause such withholding;

(5) unlawfully withhold testimony or information with respect to another person's legal claim or defense, except for a reasonable claim for witness fees or expenses;

(6) expose the person threatened to hatred, contempt, disgrace, or ridicule;

(7) falsely harm the credit or business reputation of the person threatened; or

(8) cause the evacuation of a dwelling, a building, another structure, or a vehicle.

*Id.*

[15] Whether a statement is a threat is an objective question for the trier of fact. *Newell v. State*, 7 N.E.3d 367, 369 (Ind. Ct. App. 2014), *trans. denied*. A defendant's intent may be proven by circumstantial evidence alone, and knowledge and intent may be inferred from the facts and circumstances of each case. *Chastain v. State*, 58 N.E.3d 235, 240 (Ind. Ct. App. 2016), *trans. denied*. Criminal statutes must be strictly construed against the State, may not be enlarged beyond the fair meaning of the language used, and may not be held to include offenses other than those clearly defined. *J.T. v. State*, 718 N.E.2d 1119, 1124 (Ind. Ct. App. 1999).

[16] The State alleged that E.B. committed two acts of intimidation. The State first alleged under Specification One that E.B.: (1) communicated a threat (2) to commit a forcible felony (3) to another person (4) with the intent (4) that Tanksley be placed in fear of retaliation for a prior lawful act. Ind. Code § 35-45-2-1(a) & (b); Appellant's App. Vol. 2, p. 9. E.B. argues the State failed to prove that he communicated a threat with the intent of placing Tanksley in fear.

In response, the State argues the evidence is sufficient because E.B.'s sister told Tanksley that she had overheard E.B. talking on the telephone.

[17] It is well-established that a defendant need not speak directly with a victim to communicate a threat for purposes of Indiana Code section 35-45-2-1. For example, in *Ajabu v. State*, 677 N.E.2d 1035, 1043 (Ind. Ct. App. 1997), *trans. denied*, the defendant told reporters that a person who had supported the imposition of the death penalty against the defendant's son might be subjected to the death penalty herself and further indicated that the person was eligible for such a punishment. This Court deemed the defendant's statement to the media was sufficient evidence of communication of a threat to the victim, even though she was not present when the defendant made the statement.

[18] Similarly, in *S.D. v. State*, 847 N.E.2d 255, 258-59 (Ind. Ct. App. 2006), *trans. denied*, a juvenile told a teacher and several students that she would kill another teacher (who was not in the room) and use grenades to blow up the school, and she did not care if the listeners told the absent teacher. This Court determined S.D. communicated the threat because she knew or had good reason to know that the victim would hear her statements. *See also Newell*, 7 N.E.3d at 370 (there was sufficient evidence defendant intended to communicate a threat to the victim, the manager of an apartment complex, because defendant made the threat in the presence of a security guard that the defendant knew would report the threat to the manager).

[19] Nevertheless, it remains true that to communicate a threat for purposes of the offense of intimidation, the statement must be transmitted in such a way that the defendant knows or has good reason to know the statement will reach the victim. *Ajabu*, 677 N.E.2d at 1043. In *J.T. v. State*, J.T. and a friend printed a document in their school library. 718 N.E.2d at 1121. The document contained a reference to sacrificing a fellow student in an occult ritual. The librarian saw the document and reported it to her supervisors, who later told the student who was named in the document.

[20] A juvenile court determined J.T. was a delinquent child because, among other grounds, she committed an act that would have constituted intimidation if committed by an adult. This Court reversed that portion of the adjudication, reasoning that there was no evidence that J.T. knew or had reason to believe that the document would reach the student named therein. Instead, J.T. merely printed the document with the expectation that it would be returned to her.

[21] In the current case, Em.B. was passing by E.B.'s room when she overheard him talking with someone on the telephone. She heard him say that he was going to bring a gun to school and shoot Tanksley because he did not like him. We do not know who E.B. was talking with or what else was said during the conversation. E.B. did not tell anyone else about shooting Tanksley. Em.B. told Tanksley about E.B.'s statement, but E.B. did not direct her to do that. There is no evidence that E.B. made his statement with knowledge or reason to believe that his statement would reach Tanksley. The circumstances here more closely resemble those of *J.T.* than those of *Ajabu*, *S.D.*, or *Newell*. In *J.T.*, the

librarian's interception of J.T.'s document led to the discovery of its contents. In this case, Em.B.'s eavesdropping on E.B. led to the discovery of his private phone conversation. In both cases, there is no evidence of communication of a threat by the juvenile in question.

[22] There is no dispute that E.B.'s statement was disturbing, and Tanksley had every right to be concerned. Regardless, E.B.'s conduct does not meet the statutory definition of intimidation due to lack of evidence regarding whether he communicated a threat, and we must reverse that portion of the juvenile court's adjudication.

[23] We reach a different conclusion with respect to the second allegation of intimidation, Specification Two. The State alleged that E.B. committed the offense of intimidation by: (1) communicating a threat (2) to J.B. (3) to commit a forcible felony (4) with the intent (5) of interfering with the occupancy of the high school. Ind. Code § 35-45-2-1(a) & (b); Appellant's App. Vol. 2, p. 38.

[24] E.B. argues he never intended to interfere with the occupancy of the school and lacked the means to carry out the shooting. The State responds that there is ample evidence that he intended to disrupt the occupancy of the high school. We agree with the State. E.B. told J.B. that on the following Tuesday, J.B. should "wear red and get under the desk" when he heard music. *Id.* at 24. E.B. encouraged J.B. to share these instructions, advising him to tell "the ones that [he] care[s] about." *Id.* at 25. J.B. followed E.B.'s directives, telling fellow students via text messages and in personal conversations that they needed to

wear red next Tuesday and hide under their desks when they heard music over the public-address system. J.B. told his fellow students that the instructions came from E.B. and that they should share the instructions with others.

[25] A reasonable person could extrapolate from J.B.'s communications that E.B. was threatening to engage in an act of violence, and the wearing of a red shirt would be a signal that the person should be spared. Furthermore, having told J.B. to share the instructions with anyone he cared about, without limitation, it should have been foreseeable to E.B. that news of E.B.'s plan would spread throughout the school. Word did spread, and after the school informed parents about the incident, absenteeism more than doubled the following day.

[26] In addition, the officers found a plan of attack and some of the items listed on the plan in E.B.'s bedroom, which is further evidence of his intent to disrupt the occupancy of the school, regardless of whether he actually possessed guns on the day his room was searched. This is sufficient evidence from which the finder of fact could have determined beyond a reasonable doubt that E.B. intended to commit intimidation through interfering with the occupancy of his high school.

# Conclusion

[27] We reverse the juvenile court's determination that E.B. was a delinquent child for committing an act that, if committed by an adult, would have constituted intimidation of Tanksley (Specification One). We affirm the juvenile court's

delinquency adjudication as to the second act of intimidation, interfering with the occupancy of a school (Specification Two).

[28] Affirmed in part and reversed in part.

Riley, J., and Altice, J., concur.